UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: __3/21/2019__

-----------------------------------------------------------X
                           :

HERRY RAMOS-NUNEZ,              :
                           :

                 Plaintiff,    :              16-cv-4727 (VSB)
                           :              14-cr-102 (VSB)

         -against-        :

                           :        **OPINION & ORDER**

UNITED STATES OF AMERICA,    :
                           :

             Defendant.  :
-----------------------------------------------------------X

Appearances:

Herry Ramos-Nunez
Philipsburg, PA
*Pro se Plaintiff*

Eun Young Choi
U.S. Attorney's Office, SDNY
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

On June 17, 2016, pro se Plaintiff Herry Ramos-Nunez initiated this action by filing a

motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence imposed in the

underlying criminal action on the basis that he was denied the effective assistance of counsel at

trial.  Because the record conclusively establishes that Plaintiff's Sixth Amendment rights were

not violated, the motion is DENIED.

I.      **Background and Procedural History**

On January 13, 2014, Ramos-Nunez, along with a co-defendant, was charged by criminal

complaint with one count of conspiracy to distribute and possess with the intent to distribute a

controlled substance, in violation of 21 U.S.C. § 846.  (Doc. 1.)[1]  On February 11, 2014, a grand

---

[1] For convenience, unless otherwise noted, all citations to the docket are to the criminal docket in Case No. 14-cr-

jury returned a three-count indictment charging Ramos-Nunez and his co-defendant with similar controlled substance offences. (Doc. 8.) On July 1, 2014, a grand jury returned a superseding indictment against Ramos-Nunez. (Doc. 28.) Count One charged Ramos-Nunez with having participated in a conspiracy to distribute and possess with intent to distribute 1 kilogram and more of mixtures and substances containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A). This count exposed Ramos-Nunez to a mandatory minimum sentence of ten years, representing an increase in the mandatory minimum sentence from five years based on the charges in the original indictment. Counts Two and Three charged Ramos-Nunez with substantive counts of distribution and possession with intent to distribute heroin, in connection with seizures that occurred on January 7 and January 13, 2014. (*Id.*)

Ramos-Nunez was arraigned on the superseding indictment on July 2, 2014 and proceeded to trial on July 15. (*See* Doc. 31.) The evidence presented at trial proved that Ramos-Nunez conspired with his co-defendant, Edwin Liriano, and others to supply heroin to an individual who Ramos-Nunez believed intended to resell the heroin in Pennsylvania, but who was in fact a confidential informant (and later a cooperating witness at trial) (the "CW") working at the direction of the Drug Enforcement Administration ("DEA"). (*See* Gov't Opp. 1.)[2] Over the course of approximately one week, Ramos-Nunez supplied the CW with a one-gram sample of heroin and then 700 grams of heroin. (*Id.*) In addition, Ramos-Nunez, Liriano, and the CW discussed plans for Ramos-Nunez to supply the CW with another kilogram of heroin, but Ramos-Nunez was arrested before that plan came to fruition. (*Id.*)

---

102, which includes documents from the underlying criminal case as well as those pertaining to Ramos-Nunez's § 2255 motion.

[2] "Gov't Opp." refers to the Government's Opposition to Herry Ramos-Nunez's Motion Under 28 U.S.C. § 2255, filed on December 5, 2016. (Doc. 103.)

The evidence presented at trial included: (i) audio recordings of conversations between the CW and Ramos-Nunez and Liriano; (ii) the one-gram sample and 700 grams of heroin that Ramos-Nunez provided to the CW; and (iii) the testimony of the CW. (*Id.* at 2.) The trial focused on events occurring on three days in January 2014. On January 7, the CW, who was wearing a concealed recording device, met with Liriano at a gas station in the Bronx. (Trial Tr. 312–13, 316).[3] During the meeting, Liriano explained to the CW that he had a supplier (Ramos-Nunez) who could provide high-quality heroin to the CW at a price of $58 per gram. (*Id.* at 312–23.) When the CW expressed interest in the deal, Liriano placed a call to Ramos-Nunez to obtain a sample of heroin. (*Id.* at 325–28.) Ramos-Nunez and Liriano proceeded to have a series of telephone calls to coordinate the delivery of the sample. (*Id.* at 327–34.) Liriano and the CW then picked up Ramos-Nunez in Queens and the three of them drove to Brooklyn to obtain the sample. (*Id.* at 334–35.)

During the drive from Queens to Brooklyn, Ramos-Nunez discussed various aspects of the drug trade with Liriano and the CW, including the best parts of New York City in which to conduct drug transactions to avoid police detection, and the various methods that Ramos-Nunez's numerous suppliers used to smuggle heroin into the country, including in porcelain jars. (*Id.* at 341–45, 374–90.) During the conversation, Liriano also asked Ramos-Nunez to make a full kilogram available right away so that the CW could buy it once he saw the sample. (*Id.* at 389.) Ramos-Nunez responded that he could only provide a sample that day, but promised the CW that, if he liked the sample and wanted to purchase larger quantities, he could call Liriano who would pass the word along to Ramos-Nunez. (*Id.* at 389–93.) Upon arriving in Brooklyn, Ramos-Nunez left the car. When he returned, he told Liriano and the CW that the person

---

[3] "Trial Tr." refers to the transcript of the jury trial, beginning on July 15, 2014. (Docs. 44, 46, 47, 50, 52, 54, 57.)

bringing the heroin would "be here in 15 minutes." (*Id.* at 396–97.) After a period of time, Ramos-Nunez received a phone call and stepped out of the car. (*Id.* at 397.) When he returned, he handed a sample of heroin to the CW and told Liriano to "call me later" if the CW and Liriano decided that they "want anything," because the person who supplied the sample had confirmed that he had a kilogram available to supply. (*Id.* at 395–99.) Ramos-Nunez then left with the person who had provided the sample. (*Id.* at 399.)

Ramos-Nunez next met with Liriano and the CW on January 9, 2014 at a diner in Queens. (*Id.* at 401–02.) The CW, who again was wearing a concealed recording device, told Ramos-Nunez and Liriano that he had two customers in Pennsylvania, one of whom wanted to buy a kilogram of heroin, and the other of whom wanted to buy 700 grams of heroin. (*Id.* at 412–13.) The three men agreed that Liriano and the CW would purchase the 700 grams, deliver it to the first customer in Pennsylvania, and then use the proceeds from that sale to buy the kilogram for the other Pennsylvania customer. (*Id.* at 405–06.) Ramos-Nunez made a call to his supplier and confirmed the arrangement. (*Id.* at 407–09.) The three men agreed that, when the time came, they would consummate the transaction on 57th Street in Queens, near Ramos-Nunez's home, where Ramos-Nunez would deliver the initial 700 grams of heroin. (*Id.* at 415–20.) When the three men exited the diner, Liriano and Ramos-Nunez left the CW and entered Ramos-Nunez's car, where Liriano gave Ramos-Nunez $22,000 as prepayment for the 700 grams. (*Id.*)

The planned sale of the 700 grams took place several days later, on January 13, 2014, when Liriano met with the CW in Queens, and Liriano proceeded to have several conversations with Ramos-Nunez on speakerphone, which were captured by the CW's concealed recording device, to arrange delivery of the drugs. (*Id.* at 435–40.) Once Ramos-Nunez reported that he

had possession of the heroin, Liriano and the CW drove in separate cars to a street corner near Ramos-Nunez's house to receive the delivery.  (*Id.* at 440–46.)  When they arrived, Ramos-Nunez entered the CW's car and gave him 703.1 grams of heroin, packaged into three square blocks wrapped in black electrical tape.  (*Id.* at 446–47, 586–87.)  After doing so, Ramos-Nunez asked the CW whether he would be interested in buying "a kilo of the black stuff"—a Mexican heroin—that Ramos-Nunez said would be arriving on Friday.  (*Id.* at 448–49.)  As Ramos-Nunez exited the CW's car, DEA agents arrested him and Liriano.  (*Id.* at 180–90, 199, 214–15, 582–83.)

In his defense, Ramos-Nunez called one witness—his domestic partner, Noelia Reyes. Reyes, who had lived with Ramos-Nunez since 2008, described their financial condition in 2014. Specifically, Reyes testified that they "were actually basically broke during that time," (*id.* at 690–91), and stated they were four payments behind on their car, a Lexus RX 350, (*id.* at 691). She also testified about the registration for the Lexus and Ramos-Nunez's possession of driver's licenses from New Jersey and Pennsylvania.  (*Id.* at 691–94.)

On July 24, 2014, the jury returned its verdict, finding Ramos-Nunez guilty on Count One (conspiracy to distribute heroin), but not guilty on Count Two (distribution of the one-gram sample on January 9) and not guilty on Count Three (distribution of the approximately 700 grams of heroin on January 13).  (*Id.* at 852–53.)  As to Count One, the jury found that the conspiracy involved 100 grams or more—but not one kilogram or more—of mixtures and substances containing heroin.  (*Id.*)  On November 10, 2014, I sentenced Ramos-Nunez principally to a term of 87 months of imprisonment.  (*See* Doc. 75.)

Ramos-Nunez timely filed a notice of appeal in which he argued that (1) I erred in failing to investigate and remedy what he described as "premature, guilt-assuming deliberations by two

jurors"; (2) the sentence imposed was procedurally unreasonable, in light of "inconsistencies in the district court's sentencing remarks and between the district court's and the jury's factual findings"; and (3) I erred in failing to find the defendant eligible for safety valve relief under U.S.S.G. § 5C1.2 and 18 U.S.C. § 3553(f). (*See United States v. Ramos-Nunez*, No. 14-4368 (2d Cir. May 5, 2015), ECF No. 42.) On February 5, 2016, the Second Circuit issued a summary order affirming the judgment of conviction, concluding that (1) any argument as to the treatment of the jurors' conversation was waived when Ramos-Nunez consented to my approach in handling the matter; (2) there was no clear error in my conclusion that Ramos-Nunez was not entitled to safety valve relief in light of the clear contradictions between Ramos-Nunez's statements which minimized his involvement in the offense, and the facts as established at trial; and (3) there was no error in my conclusion that Ramos-Nunez should be held responsible for 1.7 kilograms of heroin. *See United States v. Ramos-Nunez*, 633 F. App'x 20 (2d Cir. 2016) (summary order).

On June 17, 2016, Ramos-Nunez filed his pro se motion to vacate his sentence pursuant to 28 U.S.C. § 2255. (Doc. 99.) By Order dated June 29, 2016, I granted Ramos-Nunez an extension of time to file a memorandum of law in support of his motion. (Doc. 101.) Ramos-Nunez failed to file a memorandum and, on September 29, 2016, I entered an order granting him an additional extension of time to file a memorandum in support of his motion. (Doc. 102.) On October 6, 2016, Ramos-Nunez filed his memorandum. (*Ramos-Nunez v. United States*, No. 16-cv-4727 (S.D.N.Y. Oct. 6, 2016), ECF No. 7.) On December 5, 2016, the Government filed its brief in opposition. (Doc. 103.) On January 24, 2017, Ramos-Nunez filed a reply. (Doc. 104.)[4]

_____

[4] On January 8, 2018, Ramos-Nunez filed a Supplemental Pleading Under Federal Rules of Civil Procedure Rule 15(c)(2) in which he appears to seek leave to amend his original petition to add a claim that "his conviction was a gender-based decision." (*See* Doc. 105.) Leave to amend a habeas petition is governed by Rule 15 of the Federal Rules of Civil Procedure. *See Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir. 2001) (per curiam). Rule 15 provides

## II.    Legal Standards

### A.    *Section 2255*

28 U.S.C. § 2255 authorizes any prisoner in custody under sentence of a federal court "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  Unless the motion, case files, and record "conclusively show that the prisoner is entitled to no relief," a court must "grant a prompt hearing" and make findings of fact and reach conclusions of law regarding the issues raised in the motion.  *Id.* § 2255(b).  "To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief."  *Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013).  Where the asserted basis for relief is ineffective assistance of counsel, a hearing is required only "where the petitioner has made a 'plausible claim'" for a hearing.  *Morales v. United States*, 635 F.3d 39, 45 (2d Cir. 2011) (internal quotation marks omitted).  The movant's assertions in support of the motion need not be assumed credible if they are contradicted by the record.  *See Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009); *see also Fermin v. United States*, 859 F. Supp. 2d 590, 602 (S.D.N.Y. 2012) (finding that a testimonial hearing is not necessary when it would not succeed in proving additional material facts).

---

that courts should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nonetheless, "it is within the sound discretion of the district court to grant or deny leave to amend."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  Thus, "[l]eave to amend, though liberally granted, may properly be denied for . . . futility of amendment."  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).  "[T]he proposed new pleading" is futile if it "fails to state a claim on which relief can be granted."  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012).  Liberally construing Ramos-Nunez's submission, there are no factual allegations or legal support for his proposed amendment.  Accordingly, Ramos-Nunez's request for leave to amend is denied as futile because he fails to state a claim upon which relief can be granted.  *See Murphy v. United States*, No. 10-cr-107 (RJS), 2016 WL 6601554, at *6–7 (S.D.N.Y. Nov. 4, 2016).

## B. *Ineffective Assistance of Counsel*

"A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include entry of a plea of guilty and sentencing." *Gonzalez*, 722 F.3d at 130 (internal citations omitted). "The question of ineffective assistance is determined by a two-part test. A defendant must demonstrate '(1) that counsel's performance was so unreasonable under prevailing professional norms that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment; and (2) that counsel's ineffectiveness prejudiced the defendant such that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Habbas*, 527 F.3d 266, 273 (2d Cir. 2008) (quoting *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004)).

With respect to the first prong—deficient performance—the inquiry is "highly deferential" and requires that "every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The petitioner seeking relief must overcome the "strong presumption" that counsel's performance fell "within the wide range of reasonable professional assistance," i.e., that counsel's conduct reflected reasonable strategic choices. *Id.*

With regard to the second prong—prejudice—a reasonable probability of a different outcome means a "probability sufficient to undermine confidence in the outcome." *Id.* at 694. Specifically, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "It is not enough to show that the errors had some conceivable effect on the outcome of the

proceeding." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (internal quotation marks omitted); *see also Strickland*, 466 U.S. at 693 ("[N]ot every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding."). Moreover, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Second Circuit precedent generally "requires some objective evidence other than defendant's assertions to establish prejudice." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003).

Although a petitioner must satisfy both prongs to obtain relief, the Supreme Court has stated that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697; *see also Brown v. Artuz*, 124 F.3d 73, 80 (2d Cir. 1997) (declining to address the first prong of *Strickland* on the ground that the defendant could not satisfy the prejudice prong).

### C. *Pro Se Litigant*

A pro se litigant's filings must be held to "less stringent standards than formal pleadings drafted by lawyers." *Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993) (internal quotation marks omitted). A court must construe pro se submissions "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks omitted). A pro se litigant, however, is not exempt "from compliance with relevant rules of procedural and substantive law." *Boddie v. N.Y. State Div. of Parole*, 285 F. Supp. 2d 421, 426 (S.D.N.Y. 2003) (quoting *Traguth v. Zuck*, 710 F.2d 90,

96 (2d Cir. 1983)).

Dismissal of a pro se complaint is appropriate where a plaintiff fails to state a plausible claim supported by more than conclusory factual allegations. *See Walker v. Schult*, 717 F.3d 119, 124, 130 (2d Cir. 2013). In other words, the "duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal quotation marks omitted); *see also Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001) (concluding that standards for interpreting pro se filings "apply to *pro se* motions filed pursuant to section 2255").

**III.    Discussion**

Ramos-Nunez argues that he received ineffective assistance of trial counsel in three ways. First, Ramos-Nunez claims that his counsel failed to adequately mitigate the harm allegedly caused by two jurors who discussed the case between themselves at the beginning of trial. Second, Ramos-Nunez asserts that his counsel failed to thoroughly investigate the evidence against Ramos-Nunez. Third, Ramos-Nunez complains that his counsel failed with regard to the relevant quantity of heroin for which Ramos-Nunez was ultimately held responsible after trial, both because counsel failed to pursue a specific plea that Ramos-Nunez purportedly wished to pursue, and because counsel failed to make an adequate argument concerning the amount of heroin for which Ramos-Nunez should be responsible. I address each of these arguments below.

**A.    *Conversation between Jurors***

**1.  Relevant Facts**

After the jury was sworn in, I delivered preliminary instructions to the jury, including "not [to] discuss[] the case even among yourselves while the trial is going on." (*See* Trial Tr. 13–27.) The next day, after the lunch break on the second day of trial, defense counsel brought

to my attention that a paralegal affiliated with defense counsel had overheard two female jurors talking to one another "in the stall" of a bathroom "speaking about how [the defense] put women on the jury thinking that they were going to get sympathy out of them and ha, if that's what they thought." (*Id.* at 259.) The paralegal reported that, after making the remark, the jurors saw her "when they came out [of] the stalls, [and] they just changed their conversation." (*Id.*) I indicated that I would "hear from the parties about what they propose that I should do." (*Id.* at 259–60.) Defense counsel indicated his view that there was "at the very least" a need for a "firm instruction from the court," but recommended nothing beyond that, saying that he was inclined to "take it a step at a time." (*Id.* at 260.) I agreed with that recommendation saying, "I'll obviously hear from the parties. But I do think that another instruction would work" and suggested that the instruction be given "either at the beginning or at the end of the day." (*Id.* at 260–61.) Both the defense and the Government "agreed that an instruction is appropriate," but the Government asked for time to "consider what the appropriate instruction might be." (*Id.* at 261–62.)

Later that afternoon, after a break, defense counsel explained that he had conferred "briefly with the government" and that the parties jointly "propose[d] to . . . break a bit early" so that the defense and the Government could "work through" possible instructions and "draft something and hopefully have that read to the jury before it is released today." (*Id.* at 300.) I suggested providing the instruction the following morning so that the jurors would not "draw the conclusion that somehow this is because [the two jurors] were overheard." (*Id.* at 301.) I explained that I did not want to "overemphasize" the issue, saying that I would "much prefer it to be a more natural thing, and I can say to the jurors that we have now had testimony for several days, and I will review with you some of the basic instructions I gave you initially for just a few minutes." (*Id.*) Defense counsel agreed saying, "I think that is probably the best course for us to

do it first thing in the morning." (*Id.* at 302.)

Overnight, both parties separately submitted proposed instructions. (*See id.* at 356.) The next day, in order to reconcile the parties' differing proposals, I directed the parties to "discuss and see exactly if you can reach agreement as to what you want to do." (*Id.* at 356.) After conferring, the parties reported that they had arrived at an "agreed-upon proposed instruction." (*Id.* at 361–62.) I accepted the parties' proposal, brought the jury in for the first time that morning, and delivered the following agreed-upon instruction:

> As I have mentioned to you throughout the trial, do not discuss this case with anyone while the case is going on. That includes even members of your own family and close friends. Of course, you may tell your family, friends and employer that you are a juror in this case and approximately how long you expect it to last, but do not tell them anything else about the case until after you have been discharged.

> Not discussing the case includes, as I mentioned, lobbying, Tweeting or any sort of social networking. Until you are discharged, you cannot say anything by any means or in any form other than you are on a jury. Speaking to others about any aspect of the case including your impressions of me or my staff, the attorneys or others working on the trial, including the interpreters or court reporters, or even discussing the way in which the jury was selected could compromise your fairness to the parties.

> I cannot emphasize strongly enough how important it is you do not discuss the case in person, social media or otherwise until the case is over. Remember my instruction that you not discuss the case also includes not discussing the case amongst yourselves while the trial is going on.

> Jurors must not engage in discussion of a case before they have heard both the evidence and the court's instructions and have begun formally deliberating as a collective body. This rule is important because experience has shown that when people express an opinion about a case or about a witness, they may become attached to that opinion, and their views may harden and it is important that it does not happen, you keep an open mind until you have heard all of the evidence.

> Do not talk about the case even with each other until I have told you to do so. Not talking to each other about the case includes again social media, texting and the like.

(*Id.* at 362, 370–72.) No other incidents regarding juror conduct needed to be addressed or

brought to my attention during the duration of the trial.

### 2. Analysis

Ramos-Nunez argues that his trial counsel was ineffective with regard to his handling of the jurors' conversation because counsel "did nothing more than agree with the Judge, making no objection at all and did not ask for a mistrial." (Pet. Mem. 10.)[5] Ramos-Nunez contends that the jurors engaged in premature discussions about his guilt which denied him a fair trial, and that counsel was obligated to request a hearing and move for an immediate mistrial. (*Id.* at 13–15.) I find that Ramos-Nunez's arguments are without merit.

Ramos-Nunez cannot establish prejudice under *Strickland*. To satisfy that prong, a petitioner must present evidence, not mere conclusory allegations, that trial counsel's failure to more aggressively pursue the juror issue, either through additional investigation or a request for a mistrial, resulted in prejudice. *See, e.g.*, *Brown*, 124 F.3d at 80 ("[E]ven if Brown's conclusory allegation raised an issue on the performance prong of *Strickland*, Brown cannot satisfy the prejudice prong of the *Strickland* test." (internal quotation marks omitted)); *see also Guerrero v. United States*, No. 1:07-CR-0248-GHW, 2017 WL 1435743, at *7 (S.D.N.Y. Apr. 20, 2017) (noting that "undetailed and unsubstantiated assertions have consistently been held insufficient to satisfy either *Strickland* prong" (internal quotation marks omitted)). Ramos-Nunez does not provide any evidence that the verdict or outcome would have been any different had defense counsel either pursued or requested a further investigation into the jurors' conversation, or requested a mistrial. Moreover, as the Second Circuit held in *United States v. Abrams*, in the context of allegations of premature jury deliberations where "the jurors were given a curative

---

[5] "Pet. Mem." refers to Ramos-Nunez's Memorandum of Law in Support of Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, filed on October 6, 2016. *Ramos-Nunez v. United States*, No. 16-cv-4727 (S.D.N.Y. Oct. 6, 2016), ECF No. 7.

instruction," and where "any exchanges among the jurors took place . . . before any appreciable evidentiary presentation" by the Government, "any possible prejudice [is] unlikely." 137 F.3d 704, 708–09 (2d Cir. 1998); *see also id.* at 709 ("Prejudice is generally the touchstone of entitlement to a new trial when improper intra-jury influences are at issue." (internal quotation marks omitted)). Ramos-Nunez has not proffered any basis to conclude otherwise.

Even if Ramos-Nunez could satisfy *Strickland*'s prejudice prong, defense counsel's performance cannot be viewed as an error "so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *Wilson v. Mazzuca*, 570 F.3d 490, 502 (2d Cir. 2009). The Second Circuit has concluded that, in dealing with juror misconduct, a district court's curative instruction can suffice to protect a defendant's right to a fair trial. *See, e.g.*, *United States v. Siegel*, 271 F. App'x 115, 117 (2d Cir. 2008) (summary order) ("[W]e have frequently found no abuse of discretion when judges have declined to investigate allegations of jury misconduct but instead merely reiterated their instructions against premature deliberation."); *Abrams*, 137 F.3d at 708 (concluding that "the district court did not abuse its discretion . . . by giving a curative instruction"); *United States v. Thai*, 29 F.3d 785, 803 (2d Cir. 1994) ("In many instances, the court's reiteration of its cautionary instructions to the jury is all that is necessary."). Furthermore, as I stated on the record, individualized inquiry of the jurors is often found to be "intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident," *Abrams*, 137 F.3d at 708.

Defense counsel chose to remedy the situation caused by the jurors' conversation by suggesting that I offer a mitigating statement to the jury—a procedure that has repeatedly been approved by the Second Circuit. *See supra*. Defense counsel and the Government agreed to, and I approved of, a curative instruction to mitigate any impact the jurors' conversation may have

had.  There are myriad reasons why defense counsel may have elected to proceed in this regard and decided not to pursue certain motions or other trial strategies.  Ramos-Nunez has failed to overcome the "strong presumption" that counsel's performance fell "within the wide range of reasonable professional assistance"—that is, that counsel's conduct reflected reasonable strategic choices, *Strickland*, 466 U.S. at 689, and I must be cautious to not "use hindsight to second guess [defense counsel's] strategy choices," *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

Accordingly, Ramos-Nunez's claim that he was denied his right to constitutionally effective counsel because his counsel failed to request further inquiry into the conversation between the two jurors in question, or in the alternative move for a mistrial, is dismissed.

### B.       *Counsel's Investigation of the Case*

Ramos-Nunez further asserts that his trial counsel was ineffective because he failed to "adequately investigate the evidence against Petitioner."  (Pet. Mem. 17–20.)  These claims also fail.

"[T]o successfully assert an ineffective assistance of counsel claim based on a failure to investigate, a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation."  *United States v. Peterson*, 896 F. Supp. 2d 305, 316 (S.D.N.Y. 2012) (internal quotation marks omitted).  Ramos-Nunez fails to provide any specifics about how defense counsel's investigation was inadequate and does not offer any particular facts or lines of investigation defense counsel should have pursued.  Instead, Ramos-Nunez merely asserts, without elaboration, that "defense counsel did not investigate the evidence which Petitioner was indicted upon."  (Pet. Mem. 19.)  Ramos-Nunez's conclusory allegations, without more, are plainly insufficient to sustain his burden of showing that his counsel's performance was constitutionally deficient.  *See, e.g.*, *Fernandez v. United*

*States*, No. 12-CR-445 (JMF), 2016 WL 4735370, at *4 (S.D.N.Y. Sept. 12, 2016) (dismissing § 2255 motion based on ineffective assistance where petitioner "proffer[ed] no facts that would support his claims"); *Rosa v. United States*, 170 F. Supp. 2d 388, 399, 403 (S.D.N.Y. 2001) (dismissing § 2255 motion where petitioner gave "no explanation of precisely what his attorney failed to do").

Although Ramos-Nunez's failure to provide any particulars concerning his counsel's alleged deficient performance is fatal to his ineffective assistance claim, his allegations are also contradicted by the record evidence. The evidence presented at trial included, among other things: (i) audio recordings made by the CW of conversations with Ramos-Nunez and Liriano on January 7, 9, and 13, 2014; (ii) the one-gram sample and approximately 700 grams of heroin that Ramos-Nunez provided to the CW; and (iii) the testimony of the CW. Ramos-Nunez identifies no specific facts that might have been uncovered based on further investigation that would have aided in his defense, much less that would have undermined confidence in the jury's verdict in light of the strength of the evidence presented to the jury as a whole. *See, e.g.*, *Abraham v. Lee*, No. 13 Civ. 2525 RWS, 2014 WL 3630876, at *11 (S.D.N.Y. July 22, 2014) (rejecting ineffective assistance claim as vague and conclusory where petitioner's claim for failure to investigate was "only a blanket assertion"); *Castellano v. United States*, 795 F. Supp. 2d 272, 279 (S.D.N.Y. 2011) (rejecting ineffective assistance claim where petitioner failed to identify alternative evidence that, if offered, "would have undermined confidence in the jury verdict").

Accordingly, Ramos-Nunez's ineffective assistance of counsel claim based on failure to investigate is denied.

## C.    *Drug Weight*

Lastly, Ramos-Nunez asserts a claim of ineffective assistance in connection with the drug weight ascribed to the conspiracy in which he was found to have participated.  Ramos-Nunez asserts that his trial counsel was ineffective when he "did not choose, on behalf of Petitioner . . . a guilty plea pursuant to a *Pimentel Letter*, asking the Court for a *Fatico Hearing*, to let the sentencing judge the responsibility to establish all the elements of the offense, basically the amount of drug which Petitioner should have been accountable to."  (Pet. Mem. 20.)  Ramos-Nunez also asserts that his counsel was ineffective in that he failed to convince me at the time of sentencing that the drug weight attributable to his conduct should be limited to the amount seized.  (*Id.* at 20–21.)  These arguments are unavailing in light of Ramos-Nunez's safety valve proffer, the parties' pre-trial efforts to reach a resolution of the case, the evidence presented at trial, my factual findings at sentencing, and the sentence I ultimately imposed.

### 1.  Relevant Facts

On February 12, 2014, Ramos-Nunez provided a so-called "safety valve" proffer to the Government, the details of which were summarized in a "Report of Investigation" prepared by a DEA agent who attended the session.  (*See generally* Proffer.)[6]  Ramos-Nunez asserted during the safety valve proffer that he was an ordinary businessman and that he had no interest in the drug deal for which he was arrested and charged.  Rather, Ramos-Nunez said that Liriano was an acquaintance who claimed he had a "client" in Miami who was interested in buying a particular "multi-service business" owned by Ramos-Nunez.  (*Id.* at 1.)  Ramos-Nunez stated that during a meeting regarding that possible transaction, Liriano told Ramos-Nunez that Liriano had a

---

[6] "Proffer" refers to the Report of Investigation summarizing the contents of Ramos-Nunez's safety valve proffer, dated February 12, 2014.  (Doc. 66-3.)

customer coming to town to purchase narcotics, and asked Ramos-Nunez to do him a "favor" by pretending to be a drug supplier. (*Id.* at 2.) Thus, Ramos-Nunez claimed in his proffer that everything he had said and everything he had done in connection with the charged conduct was simply part of a performance that he gave at Liriano's request. (*Id.* at 1–2.)[7]

On April 23, 2014, the Government provided defense counsel with a letter pursuant to *United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991), indicating its view at that time that Ramos-Nunez had conspired to distribute and possess with intent to distribute at least 3 kilograms but less than 10 kilograms of heroin. (*See* Gov't Opp. 20; Doc. 103-1.) In calculating what it determined to be the applicable Sentencing Guidelines range, the Government included a two-point increase based on obstruction of justice, in light of what the Government believed to be false statements made by Ramos-Nunez during his safety valve proffer. (*See* Gov't Opp. 21; Doc. 103-1.) The offense level in the letter was calculated to be 36, with a criminal history category of I, resulting in a Guidelines range of 188 to 235 months of imprisonment. (*See* Gov't Opp. 21; Doc. 103-1.)

On April 28, 2014, after discussions with defense counsel, the Government offered Ramos-Nunez a plea agreement that would have held him responsible for intent to distribute at least 700 grams but less than one kilogram of heroin—the amount that was seized by the DEA. (*See* Gov't Opp. 21; Doc. 103-2.) The plea offer did not include the two-point obstruction enhancement included in the *Pimentel* letter, and included a three-point reduction for acceptance of responsibility, thus making the applicable offense level 27, with a proposed stipulated Guidelines range of 70 to 87 months of imprisonment. (*See* Gov't Opp. 21; Doc. 103-2.)

---

[7] The Report of Investigation does not indicate that Ramos-Nunez said anything about his third meeting with the CW—the meeting on January 13, 2014 during which Ramos-Nunez delivered the roughly 700 grams of heroin.

On June 9, 2014, I held a pretrial conference during which the parties acknowledged the existence of the plea offer. The Government indicated that it had transmitted both the *Pimentel* letter and the plea offer, and that Ramos-Nunez had rejected the plea offer. (*See* Doc. 36 at 5.) Ramos-Nunez's counsel stated that "both [AUSA] Imperatore and I have communicated with Mr. Ramos Nunez both the government's plea offers as well as what the exposure under *Pimentel* or posttrial exposure may be, and he is prepared to move forward at this point." (*Id.*) Furthermore, in response to my questioning, Ramos-Nunez indicated that he understood what the Government and his lawyer had said with respect to the *Pimentel* letter and plea offer. (*Id.*) On July 1, 2014, a grand jury returned the superseding indictment, Ramos-Nunez was arraigned on July 2, and trial commenced on July 15.

Following Ramos-Nunez's trial conviction, the Probation Office prepared a Presentence Report. The Probation Office determined that the total quantity of heroin involved in the offense and in Ramos-Nunez's relevant conduct was more than three kilograms, which included: (i) the 1.2-gram heroin sample supplied to the CW; (ii) the 703.1 grams of heroin delivered to the CW; (iii) the additional one kilogram of heroin that Ramos-Nunez, Liriano, and the CW agreed Ramos-Nunez would provide to the CW after Liriano and the CW delivered the first 700 grams to the customer in Pennsylvania; (iv) 400 grams of heroin that Ramos-Nunez, while meeting with Liriano and the CW at the diner in Queens on January 9, had admitted to delivering the previous night in the Bronx; and (v) the one kilogram of Mexican black heroin that Ramos-Nunez offered to the CW right after delivering the 700 grams of heroin and right before being arrested. (Gov't Opp. 22–23 (citing Presentence Report ¶¶ 12–15).) Based on that quantity of narcotics, and using the 2013 version of the Sentencing Guidelines, the Probation Office determined that Ramos-Nunez's total offense level was 34, his criminal history category was I,

and the applicable Guidelines range was 151 to 188 months of imprisonment. (*See* Presence Report ¶¶ 21–29.)[8]

In advance of sentencing, Ramos-Nunez's counsel submitted a sentencing memorandum asserting that: (i) the drug quantity for Guidelines purposes should be based only on the 700 grams of heroin that formed the basis of the jury's verdict, resulting in an offense level of 28; and (ii) his pre-trial safety valve proffer qualified him for the safety valve, rendering inapplicable the 60-month mandatory minimum required by the jury's verdict. (*See* Doc. 63 at 3, 6.)

On November 10, 2014, I sentenced Ramos-Nunez. I found that Ramos-Nunez did not qualify for the safety valve because he was not truthful during his safety valve proffer. (*See* Sentencing Tr. 11–16.)[9] I found that Ramos-Nunez's "claimed lack of knowledge of narcotics trafficking" was "inconsistent with the evidence at trial." (*Id.* at 15.) In support of this conclusion, I relied on the numerous instances presented at trial in which Ramos-Nunez made statements that indicated that he was an experienced drug dealer and not simply someone pretending to be a drug dealer at Liriano's behest. (*Id.* at 15–16.) I also noted that Ramos-Nunez's excuse—that he was just doing and saying what Liriano had told him to do and say— did not apply to all of Ramos-Nunez's criminal conduct because, for example, Ramos-Nunez had made "no mention" in his proffer of Liriano having directed him to offer Mexican heroin to the CW. (*Id.*) Accordingly, because the facts shown at trial were "inconsistent with the proffer given by Ramos-Nunez," I concluded that Ramos-Nunez had "not proven his eligibility for [the] safety valve by a preponderance of the evidence." (*Id.* at 16.)

---

[8] On November 8, 2014, the Government submitted a letter agreeing that the November 1, 2014 Sentencing Guidelines, which had reduced by two levels the offense level applicable to most drug offenses, applied to Ramos-Nunez's sentence. (*See* Doc. 68.) As a result, the Government asserted that the appropriate offense level was 32, not 34, and the applicable Guidelines range was 121 to 151 months. (*Id.*)

[9] "Sentencing Tr." refers to the transcript of Ramos-Nunez's sentencing hearing on November 10, 2014. (Doc. 75.)

I next considered the quantity of heroin on which Ramos-Nunez's offense level would be based. (*Id.* at 16–17.) Relying on the trial evidence—including "the testimony of the cooperating witness and the transcripts of the various meetings that the part[ies] ha[d]"—I found that the appropriate quantity was approximately 1,700 grams of heroin, which was the amount that "Ramos-Nunez and Liriano agreed to sell [to] the cooperating witness" when the three met at the diner in Queens on January 9, 2014. (*Id.* at 16.) I observed that the three men had "discussed how the transactions were going to take place, and they actually discussed specifics with regard to the logistics," reaching agreement that "Liriano and the CW were going to travel to Pennsylvania to sell the 700 grams" and "[w]hen they got their money from those sales, they were then going to come back and purchase the kilo." (*Id.* at 18.) I did not include either the 400 grams that Ramos-Nunez had admitted to selling in the Bronx the night before the meeting in the Queens diner or the one kilogram of black Mexican heroin that Ramos-Nunez had offered to the CW moments before being arrested. (*Id.*)

Based on a quantity of approximately 1,700 grams of heroin, I calculated the total offense level to be 30, with a resulting Guidelines range of 97 to 121 months' imprisonment. (*Id.* at 20.) After considering the required statutory factors, I sentenced Ramos-Nunez to a below-Guidelines sentence of 87 months of imprisonment. (*Id.* at 25–27.)

## 2. Analysis

Ramos-Nunez claims that although he "told his counsel that he would plead guilty only to the drug which was seized at the moment of the arrest," his "counsel failed when [he] did nothing to stop the trial," and "when [he] did not choose . . . a guilty plea pursuant to a *Pimentel* Letter, asking the Court for a *Fatico* Hearing." (Pet. Mem. 19–20.) Ramos-Nunez fails to satisfy the performance and prejudice prongs set forth in *Strickland* and thus cannot prevail on

this claim.

Contrary to Ramos-Nunez's contention, defense counsel did procure a plea offer from the Government reflecting a drug weight of between 700 grams and 1 kilogram, representing the amount of drugs seized at the moment of arrest. Defense counsel negotiated that plea offer even after the Government had provided in its *Pimentel* letter a far more serious estimate of between 3 and 10 kilograms, and even after the Government noted its belief that an obstruction enhancement would apply in light of Ramos-Nunez's supposedly false statements made at his safety valve proffer. The record also demonstrates that, at the June 9, 2014 pretrial conference, Ramos-Nunez affirmed that he understood the implications of the *Pimentel* letter and the plea offer, and that he had rejected both. Thus, Ramos-Nunez's ultimate exposure to a weight of more than a kilogram was based on his own decision to proceed to trial rather than due to any deficient performance on the part of his counsel.

To the extent Ramos-Nunez claims that his counsel's performance was ineffective because he failed to convince me at sentencing that the drug weight attributable to Ramos-Nunez's conduct should be limited to the amount seized, that argument is equally unavailing. As outlined above, Ramos-Nunez's trial counsel submitted a sentencing memorandum asserting both that the drug quantity for Guidelines purposes should be based solely on the 700 grams of heroin that formed the basis of the jury's verdict, and that Ramos-Nunez's pre-trial safety valve proffer rendered the 60-month mandatory minimum required by the jury's verdict inapplicable. These efforts, while partially unsuccessful, cannot be described as ineffective assistance. *See, e.g.*, *Holbdy v. United States*, No. 03-CR-0243, 2008 WL 2704913, at *6 (N.D.N.Y. July 8, 2008) (denying ineffective assistance claim and concluding that "because counsel raised this precise argument in his sentencing memorandum, this claim is without substance" (internal

quotation marks omitted)).

Furthermore, Ramos-Nunez cannot establish prejudice because he has not established that my conclusion regarding the appropriate drug weight would have been any different had he chosen to plead guilty to a *Pimentel* letter and proceeded to a *Fatico* hearing. As outlined above, shortly after the June conference in which Ramos-Nunez indicated that he had rejected the Government's plea offer of at least 700 grams but less than 1 kilogram of heroin, a grand jury returned the superseding indictment charging Ramos-Nunez with having participated in a conspiracy to distribute and possess with intent to distribute at least 1 kilogram of heroin. Had Ramos-Nunez elected to plead guilty to a *Pimentel* letter at that point, he would have been subject to an automatic 120-month mandatory minimum term of imprisonment. As such, Ramos-Nunez's decision to proceed to trial was the only chance he had to receive a sentence of less than ten years of imprisonment. Putting to the side for the moment that Ramos-Nunez was facing a 120-month mandatory minimum term of imprisonment, Ramos-Nunez does not explain how a *Fatico* hearing would or even could have resulted in a different sentence. At such a hearing, the Government likely would have put forward the same evidence presented at trial— including Ramos-Nunez's recorded statements, the seizures, and the CW's testimony—and I see no reason why I would not have concluded, as I did after trial, that 1.7 kilograms of weight was the appropriate amount for purposes of the Guidelines calculation.

Because Ramos-Nunez cannot establish a reasonable probability that the outcome would have been any different had his trial counsel proceeded as Ramos-Nunez now suggests, and because the record evidence demonstrates that Ramos-Nunez likely would have been subject to a ten-year mandatory minimum had he proceeded with a plea on the eve of trial—he cannot

establish prejudice under *Strickland* and his claim is dismissed.[10]

### D. *No Evidentiary Hearing is Required*

As indicated above, § 2255 provides that a court shall hold an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Moreover, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Fed. R. Governing Sec. 2255 Proceedings in the U.S.D.C. 4(b). Here, no evidentiary hearing is required because Ramos-Nunez's motion and the record conclusively demonstrate that Ramos-Nunez is entitled to no relief under § 2255.

### IV. Conclusion

For the foregoing reasons, Ramos-Nunez's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 is DENIED. Because there has been no substantial showing of the denial of a constitutional right, no certificate of appealability shall issue. *See Krantz v. United States*, 224 F.3d 125, 127 (2d Cir. 2000).

The Clerk of Court is respectfully directed to mail a copy of this Opinion & Order to the pro se Plaintiff and close Case No. 16-cv-4727.

---

[10]  In his Summary of Argument, Ramos-Nunez also perfunctorily claims that his trial counsel "did not request the District Court to indict his client within the frame of the maximum 120 day period prescribed by the law and precedent case-law" and "did not claim that the trial of his client commenced less than 30 days after he have [sic] been arraigned before the trial judge." (Pet. Mem. 4.) However, pursuant to the Speedy Trial Act, 18 U.S.C. § 3161, I excluded time between Ramos-Nunez's first arraignment and the beginning of trial. Moreover, although the trial commenced within 30 days of Ramos-Nunez being arraigned on the superseding indictment, the Supreme Court in *United States v. Rojas-Contreras* interpreted the plain text of § 3161(c)(2) as "clearly fix[ing] the beginning point for the trial preparation period" for purposes of the subsection "as the first appearance through counsel. It does not refer to the date of the indictment, much less to the date of any superseding indictment." 474 U.S. 231, 234 (1985).

SO ORDERED.

Dated: March 21, 2019
      New York, New York

Vernon S. Broderick
United States District Judge